# NORTH DAKOTA STATE BOARD OF PHARMACY
## *v.* SNYDER'S DRUG STORES, INC.

No. 72–1176.   Argued November 6, 1973—
Decided December 5, 1973

DOUGLAS, J., delivered the opinion for a unanimous Court.

*A. William Lucas* argued the cause and filed briefs for petitioner.

*Mart R. Vogel* argued the cause and filed a brief for respondent.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

North Dakota passed a statute[1] that requires that the applicant for a permit to operate a pharmacy be

---

*\*Arthur B. Hanson, Ralph N. Albright, Jr.,* and *Sidney Waller* filed a brief for the American Pharmaceutical Assn. et al. as *amici curiae* urging reversal.

*Thomas D. Quinn, Jr.,* and *Harold Rosenwald* filed a brief for the National Association of Chain Drug Stores, Inc., as *amicus curiae* urging affirmance.

[1] N. D. Cent. Code § 43–15–35 (5) (Supp. 1973) provides:

*"Requirements for permit to operate pharmacy.*—The board shall issue a permit to operate a pharmacy, or a renewal permit, upon satisfactory proof that:

.          .          .          .          .

"5. The applicant for such permit is qualified to conduct the pharmacy, and is a registered pharmacist in good standing or is a partnership, each active member of which is a registered pharmacist in good standing, or a corporation or association, the majority stock in which is owned by registered pharmacists in good standing, actively and regularly employed in and responsible for the management, supervision, and operation of such pharmacy . . .

.          .          .          .          .

"The provision of subsection 5 of this section shall not apply to the holder of a permit on July 1, 1963, if otherwise qualified to conduct the pharmacy, provided that any such permit holder who shall discontinue operations under such permit or fail to renew such permit upon expiration shall not thereafter be exempt from the provisions of such subsection as to such discontinued or lapsed permit. The provisions of subsection 5 of this section shall not apply to hospital pharmacies furnishing service only to patients in such hospital."

"a registered pharmacist in good standing" or "a corporation or association, the majority stock in which is owned by registered pharmacists in good standing, actively and regularly employed in and responsible for the management, supervision, and operation of such pharmacy."

Petitioner Board denied a permit to Snyder's Drug Stores, Inc., because it did not comply with the stockownership requirements of the statute, it appearing that all the common stock of Snyder's was owned by Red Owl Stores and it not being shown if any Red Owl shareholders were pharmacists registered and in good standing in North Dakota. On appeal to the state district court, summary judgment was granted Snyder's. On appeal to the Supreme Court of North Dakota, that court held [2] that the North Dakota statute was unconstitutional by reason of our decision in 1928 in *Liggett Co.* v. *Baldridge,* 278 U. S. 105. That case involved a Pennsylvania statute that required that 100% of the stock of the corporation be owned by pharmacists. The North Dakota statute, however, requires only that a majority of the stock be owned by pharmacists. But the North Dakota Supreme Court held that the difference did not take this case out from under the *Liggett* case because under both statutes control of the corporation having a pharmacy license had to be in the hands of pharmacists responsible for the management and operation of the pharmacy. That court therefore remanded the case, so that the Board could conduct "an administrative hearing on the application, *sans the constitutional issue,* pursuant to our Administrative Agencies Practice Act," 202 N. W. 2d 140, 145 (italics added).

The case is here on a petition for certiorari which we granted, 411 U. S. 947.

---

[2] 202 N. W. 2d 140.

## I

We are met at the outset with a suggestion that the judgment of the Supreme Court of North Dakota is not "final" within the meaning of 28 U. S. C. § 1257 which restricts our jurisdiction to review state court decisions.[3]

The finality requirement of 28 U. S. C. § 1257, which limits our review of state court judgments, serves several ends: (1) it avoids piecemeal review of state court decisions; (2) it avoids giving advisory opinions in cases where there may be no real "case" or "controversy" in the sense of Art. III; (3) it limits review of state court determinations of federal constitutional issues to leave at a minimum federal intrusion in state affairs.

Mr. Justice Frankfurter, writing for the Court in *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 124, summarized the requirement by Congress that in appeals from federal district courts as well as in review of state court decisions the judgments be "final":

> "This requirement has the support of considerations generally applicable to good judicial administration. It avoids the mischief of economic waste and of delayed justice. Only in very few situations, where intermediate rulings may carry serious public consequences, has there been a departure from this requirement of finality for federal appellate jurisdiction. This prerequisite to review derives added force when the jurisdiction of this Court is invoked to upset the decision of a State court. Here we are in the realm of potential conflict between the courts of two different governments. And so, ever since 1789, Congress has granted this Court the power to intervene

---

[3] "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court . . . ." 28 U. S. C. § 1257.

in State litigation only after 'the highest court of a State in which a decision in the suit could be had' has rendered a 'final judgment or decree.' § 237 of the Judicial Code, 28 U. S. C. § 344 (a). This requirement is not one of those technicalities to be easily scorned. It is an important factor in the smooth working of our federal system."

But, as he pointed out, this concept of "finality" has a "penumbral area." *Ibid.* Speaking for the Court in that case, he held that Nebraska's ruling on the legality of a radio license issued by the Federal Communications Commission could be reviewed even though the state court had not yet determined the final accounting. He stated: "Of course, where the remaining litigation may raise other federal questions that may later come here . . . to allow review of an intermediate adjudication would offend the decisive objection to fragmentary reviews." *Id.*, at 127.

*Mills* v. *Alabama*, 384 U. S. 214, involved the constitutionality of a state statute in effect making it a crime for a newspaper editor on election day to urge people to vote a certain way on the issues being submitted. The state court held the act did not violate the Federal Constitution and remanded the case for trial. It was argued that the judgment was not "final" for purposes of 28 U. S. C. § 1257. We noted that the point had "a surface plausibility, since it is true the judgment of the State Supreme Court did not literally end the case." 384 U. S., at 217. We held it "final," however, because if the Act were constitutional the editor would in reality have no defense. Since conviction seemed likely, we concluded that to deny review at that stage would "result in a completely unnecessary waste of time and energy in judicial systems already troubled by delays due to congested dockets." *Id.*, at 217–218.

In *Hudson Distributors, Inc.* v. *Eli Lilly & Co.*, 377 U. S. 386, the question on the merits was whether the require-

ment of a state act setting minimum retail prices was consonant with federal law. The state court held the state act constitutional under both the State and the Federal Constitutions and remanded the case for further proceedings. In reliance on *Curry* and on *Langdeau* [4] we held that the fact that there were to be further proceedings in the state court did not render the state judgment "nonfinal or unappealable within the meaning of 28 U. S. C. § 1257." *Id.*, at 389 n. 4.

The exceptions noted [5] have a long lineage dating back

---

[4] We held in *Local No. 438* v. *Curry*, 371 U. S. 542, that a state court judgment which authorized a temporary injunction against picketing because in the court's view the National Labor Relations Board did not have exclusive jurisdiction was "final" for purposes of 28 U. S. C. § 1257. We did not wait until the litigation had been resolved in the state court, as the state court had finally determined its jurisdiction and erroneously so. 371 U. S., at 548.

In *Mercantile National Bank* v. *Langdeau*, 371 U. S. 555, a receiver for a Texas insurance company sued two national banks, and the only question tendered on appeal from the state court concerned the question of venue, *viz.*, in what state court a national bank could be sued. It was argued that the state court judgment was not "final" for purposes of 28 U. S. C. § 1257. We rejected that view, holding the judgment "final" and saying: "[W]e believe that it serves the policy underlying the requirement of finality in 28 U. S. C. § 1257 to determine now in which state court appellants may be tried rather than to subject them, and appellee, to long and complex litigation which may all be for naught if consideration of the preliminary question of venue is postponed until the conclusion of the proceedings." 371 U. S., at 558.

[5] In *California* v. *Stewart*, 384 U. S. 436, 498–499, in a capital case the State Supreme Court set aside the verdict on a federal constitutional ground and directed that the defendant (respondent) be retried. He moved that we dismiss the State's petition, which we had granted, for lack of a "final" judgment. We noted, however, that if on a retrial he were acquitted, there was no appeal available to the State. We therefore held that the judgment under review was "final" for our purposes. *Id.*, at 498 n. 71.

In *Brady* v. *Maryland*, 373 U. S. 83, the state court had given a defendant post-conviction relief and remanded the case for retrial

to Mr. Chief Justice Taney's opinion in *Forgay* v. *Conrad,* 6 How. 201, where the Court held "final" an interlocutory decree requiring a litigant "to deliver up property which he claims," even though a final accounting has yet to be made. *Id.,* at 205. Unless that interlocutory order was deemed "final," Mr. Chief Justice Taney pointed out, the "right of appeal is of very little value to him and he may be ruined before he is permitted to avail himself of the right." *Ibid.*

It is equally important that we treat the judgment in the instant case as "final," for we have discovered no way which the licensing authority in North Dakota has of preserving the constitutional question now ripe for decision.

The Board here denied respondent's application without an evidentiary hearing since the application showed that under the North Dakota Act respondent could in no way qualify for a license. The State Supreme Court held that Act unconstitutional and that thus an applicant failing to meet the requirements of the state statute is nevertheless entitled to consideration for a license. As previously noted, the State Supreme Court, indeed, directed the Board on remand to reconsider the application *"sans"* the constitutional question.

There were state law questions to be considered on the remand, for the state board had also rested its denial of a permit on the failure of Snyder's to meet certain structural and safety standards. The Supreme Court

---

on the question of punishment. We took the case to determine whether the suppression of evidence by the prosecution entitled the defendant to a retrial on the issue of guilt as well as punishment. We held that the issue of guilt was quite independent of the issue of punishment and that it was time to decide the due process and/or equal protection questions presented by the state decision.

remanded for an administrative hearing on those other issues.

If we deny review at this point, respondent has no constitutional barrier to the grant of a license.

The state licensing authority might, of course, after an administrative hearing reinstate its earlier findings that the respondent does not meet the necessary structural and safety standards. If respondent is denied a license for that reason, the denial will obviously be on a state ground. If respondent is granted a license, the battle over the constitutionality of the new Act will be lost as far as this case is concerned.

There is no suggestion that "the remaining litigation may raise other federal questions," *Radio Station WOW* v. *Johnson,* 326 U. S., at 127, "such as is true of eminent domain cases." *Ibid.* For in those cases the federal constitutional question embraces not only a taking, but a taking on payment of just compensation. A state judgment is not final unless it covers both aspects of that integral problem. See *Grays Harbor Co.* v. *Coats-Fordney Co.,* 243 U. S. 251, 256.

It would appear that, as a matter of North Dakota procedure, the only way in which the Board could preserve the constitutional issue would be to defy its own State Supreme Court and deny the application on the ground of failure to meet the ownership requirement. The state Administrative Agencies Practice Act provides that: "Any party to any proceeding heard by an administrative agency" may appeal from the decision of the agency. N. D. Cent. Code § 28–32–15. The statute appears to treat the agency as a tribunal and not as a "party" able to appeal its own order.

If the Board thus grants the license in accordance with the State Supreme Court decision and then seeks to appeal its own grant on the basis of the validity of the state ownership requirement, the appeal may well be

dismissed and the dismissal would rest on the independent state ground that state procedural law does not provide the agency the right to appeal.

## II

*Liggett,* decided in 1928, belongs to that vintage of decisions which exalted substantive due process by striking down state legislation which a majority of the Court deemed unwise. *Liggett* has to date not been expressly overruled. We commented on it disparagingly, however, in *Daniel* v. *Family Security Life Ins. Co.,* 336 U. S. 220, which concerned the constitutionality of a state statute providing that life insurance companies and their agents may not operate an undertaking business and undertakers may not serve as agents for life insurance companies. We noted that *Liggett* held that it was "clear" that "mere stock ownership in a corporation, owning and operating a drug store, can have no real or substantial relation to the public health; and that the act in question creates an unreasonable and unnecessary restriction upon private business," 278 U. S., at 113. In *Daniel,* however, we stated that "a pronounced shift of emphasis since the *Liggett* case," 336 U. S., at 225, had deprived the words "unreasonable" and "arbitrary" of the meaning which *Liggett* ascribed to them. We had indeed held in *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525, that a State had power, so far as the Due Process Clause of the Fourteenth Amendment was concerned, to legislate that no person should be denied the opportunity to obtain or retain employment because he was or was not a member of a labor union. After reviewing *Nebbia* v. *New York,* 291 U. S. 502, *Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1, we said:

"This Court beginning at least as early as 1934, when the *Nebbia* case was decided, has steadily

rejected the due process philosophy enunciated in the *Adair-Coppage* line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. . . . Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." 335 U. S., at 536–537.

We reached the same result in *Ferguson* v. *Skrupa*, 372 U. S. 726, where we sustained the constitutionality of a state law prohibiting persons other than lawyers from engaging in the business of debt adjusting and debt pooling. We said:

"We conclude that the Kansas Legislature was free to decide for itself that legislation was needed to deal with the business of debt adjusting. Unquestionably, there are arguments showing that the business of debt adjusting has social utility, but such arguments are properly addressed to the legislature, not to us. We refuse to sit as a 'superlegislature to weigh the wisdom of legislation,' and we emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' Nor are we able or willing to draw lines by calling a law 'prohibitory' or 'regulatory.' Whether the legislature

takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes, or some other is no concern of ours. The Kansas debt adjusting statute may be wise or unwise. But relief, if any be needed, lies not with us but with the body constituted to pass laws for the State of Kansas." *Id.*, at 731–732 (footnotes omitted).

The majority of the Court in *Liggett* for which Mr. Justice Sutherland spoke held that business or property rights could be regulated under the Fourteenth Amendment only if the "legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare," 278 U. S., at 111–112. The majority held the Act governing pharmacies "creates an unreasonable and unnecessary restriction upon private business." *Id.*, at 113. The opposed view stated by Mr. Justice Holmes, and concurred in by Mr. Justice Brandeis, was:

"A standing criticism of the use of corporations in business is that it causes such business to be owned by people who do not know anything about it. Argument has not been supposed to be necessary in order to show that the divorce between the power of control and knowledge is an evil. The selling of drugs and poisons calls for knowledge in a high degree, and Pennsylvania after enacting a series of other safeguards has provided that in that matter the divorce shall not be allowed. Of course, notwithstanding the requirement that in corporations hereafter formed all the stockholders shall be licensed pharmacists, it still would be possible for a stockholder to content himself with drawing dividends and to take no hand in the company's affairs. But obviously he would be more likely to observe the business with an intelligent eye than a casual

investor who looked only to the standing of the stock in the market. The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least to make the evil less." *Id.*, at 114–115.

Those two opposed views of public policy are considerations for the legislative choice. The *Liggett* case was a creation at war with the earlier constitutional view of legislative power, *Munn* v. *Illinois,* 94 U. S. 113, 132, 134, and opposed to our more recent decisions. *Olsen* v. *Nebraska,* 313 U. S. 236, 241; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 487–488; *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, as well as the *Daniel, Lincoln Union,* and *Ferguson* cases already discussed. The *Liggett* case, being a derelict in the stream of the law, is hereby overruled. We reverse and remand the judgment below and free the courts and agencies of North Dakota from what the State Supreme Court deemed to be the mandate of *Liggett.*

*So ordered.*