METROPOLITAN LIFE INSURANCE COMPANY, Prudential Insurance Company of America, Prudential Property and Casualty Insurance Company, Massachusetts Mutual Life Insurance Company, Plaintiffs, Appellants and Cross-Appellees,

v.

The COMMISSIONER OF the DEPARTMENT OF INSURANCE of North Dakota, and the State of North Dakota, Defendants, Appellees and Cross-Appellants.

METROPOLITAN LIFE INSURANCE COMPANY, Mutual Life Insurance Company of New York, Equitable Life Assurance Society of the United States, Prudential Insurance Company of America, Prudential Property and Casualty Insurance Company, Transamerica Occidental Life Insurance Company (formerly Occidental Life Insurance Company of California), Transamerica Life Insurance and Annuity Company, Massachusetts Mutual Life Insurance Company, New York Life Insurance Company, Connecticut Mutual Life Insurance Company, John Hancock Mutual Life Insurance Company, Aetna Life Insurance Company, Standard Fire Insurance Company, Aetna Casualty and Surety Company, the Automobile Insurance Company of Hartford, Connecticut, and Manhattan Life Insurance Company, Plaintiffs and Appellants,

v.

The COMMISSIONER OF the DEPARTMENT OF INSURANCE of North Dakota, and the State of North Dakota, Defendants and Appellees.

Civ. Nos. 10510, 10517.

Supreme Court of North Dakota.

Aug. 15, 1985.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiffs, appellants and cross-appellees, argued by Mart R. Vogel.

Robert O. Wefald, Sp. Asst. Atty. Gen., Bismarck, for defendants, appellees and cross-appellants.

ERICKSTAD, Chief Justice.

These consolidated appeals present the question whether or not North Dakota's pre-1983 version of the 2½ percent gross insurance premiums tax, § 26–01–11(1), N.D.C.C., from which insurance companies organized under the laws of this state were exempt, violates the equal protection components of the State and Federal Constitutions. The district court determined that the statute is unconstitutional and issued an injunction prohibiting its enforcement, but the court refused to grant damages or refunds for the tax years 1971 through 1981 to the 16 out-of-state (foreign) insurance companies that challenged the tax. The foreign insurance companies [plaintiffs] appeal from that part of two district court judgments denying their claims for refunds. The Commissioner of Insurance and the State [State] have cross-appealed

from that part of one of the judgments holding § 26–01–11(1), N.D.C.C., unconstitutional. We affirm.

Prompted by the United States Supreme Court's decision in *Western & Southern Life Ins. Co. v. State Board of Equalization of California*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), 18 foreign insurance companies brought two separate actions in December 1981 challenging the constitutionality of the gross premiums tax. District court case number 31,865 was filed by five of the companies and number 31,866 was filed by the remaining 13 companies. The complaints were substantively identical and alleged that the gross premiums tax was unconstitutional under the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution and under Article I, § 22 of the North Dakota Constitution. Each complaint also alleged a cause of action under 42 U.S.C. § 1983. The companies requested a declaratory judgment that § 26–01–11(1), N.D.C.C., is unconstitutional on its face and as applied to them; temporary and permanent injunctive relief enjoining the defendants from enforcing the provisions of the statute; a "refund of all premium taxes paid by the plaintiffs from 1970 to the present, an amount in excess of $6,500,000.00;" and attorney fees, disbursements and costs pursuant to 42 U.S.C. § 1988. These cases were consolidated for trial.

Prior to trial, the district court granted the plaintiffs' motion to sever for trial the claims of Metropolitan Life Insurance Company, Prudential Insurance Company of America, Prudential Property and Casualty Insurance Company, and Massachusetts Mutual Life Insurance Company. The plaintiffs "stipulated that the constitutional claims of the remaining plaintiffs are identical and a decision applicable to the four plaintiffs identified above will also bind the remaining plaintiffs on the merits except

any issues relating to damages." A bench trial was held on October 25 and 27, 1982.

On January 13, 1983, 16 of the foreign insurance companies filed another action, district court case number 33,327, which was substantively identical to the other actions but sought "[d]amages based on taxes paid by the plaintiffs during 1982 for the tax year 1981 and for taxes paid in all subsequent years."

The district court issued its memorandum opinion in case numbers 31,865 and 31,866 on February 15, 1983. The court (1) determined that § 26–01–11(1), N.D.C.C., is violative of the Equal Protection Clauses of the United States and North Dakota Constitutions; (2) dismissed the § 1983 action against the Commissioner of Insurance and denied the request for attorney fees;[1] (3) granted permanent injunctive relief against the defendants enjoining them from enforcing the provisions of the statute; and (4) dismissed the companies' claims for refunds based on principles of voluntary payment, laches, sovereign immunity, windfall profit, and the *"Sunburst* Doctrine." In a separate order concerning case number 33,-327, the district court also dismissed the 16 companies' claims for refunds for the 1981 tax year. The court determined that this action was "barred by concepts of res judicata, collateral estoppel, and merger and bar."

Following the issuance of the district court's initial memorandum opinion declaring § 26–01–11(1), N.D.C.C., unconstitutional, the 1983 Legislature amended the gross premiums tax provision by imposing the tax on both North Dakota-incorporated and foreign-incorporated insurance companies. The Legislature also made the amendment retroactive "to taxable years beginning after December 31, 1981, ..." 1983 N.D. Sess.Laws Ch. 333, § 11.

Judgments were entered on both actions during the summer of 1983, and these appeals followed. Supreme Court appeal number 10,510 concerns the claims of the

---

**1.** The district court dismissed the § 1983 claim against the State in a pretrial motion for summary judgment. The plaintiffs have not specifically challenged on appeal the district court's dismissal of the § 1983 action against the State or the Commissioner of Insurance.

four companies that went to trial in October 1982 that they are entitled to damages for the tax years 1971 through 1980. Supreme Court appeal number 10,517 concerns the claims of the 16 companies that they are entitled to refunds for 1981 taxes paid under protest. The appeals were consolidated upon the plaintiffs' motion, which was supported by the State.

By stipulation between the parties, the presentation and argument of the case before this court was suspended pending a decision by the United States Supreme Court in a similar case arising out of the state of Alabama. On March 26, 1985, the United States Supreme Court issued its opinion in *Metropolitan Life Ins. Co. v. Ward*, — U.S. —, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). Supplemental briefs were then filed by the parties in this case and oral arguments were held before this court on May 7, 1985.

I

## CONSTITUTIONALITY OF THE GROSS PREMIUMS TAX

Prior to its amendment and reenactment by the 1983 Legislature,[2] § 26–01–11(1), N.D.C.C., provided:

*"26–01–11. Commissioner of insurance to collect premium tax—Insurance companies generally—Domestic fire insurance companies—Computation.*—Before issuing the annual certificate required by law, the commissioner of insurance shall collect the following annual taxes from insurance companies doing business within the state:

"1. From every insurance company doing business in this state *except stock and mutual companies organized under the laws of this state*, a tax equal in amount to two and one-half percent of the gross amount of premiums, membership fees, and policy fees received in this state during the preceding year, such tax to be payable at the time when the annual statement of business required by law is filed; provided, however, that this tax shall not apply to considerations for annuities." [Emphasis added.]

Under this statute, foreign insurance companies were subject to an annual assessment of 2½ percent on the gross amount of premiums, membership fees, and policy fees received from North Dakota policyholders. The tax was not imposed on insurance companies incorporated under the laws of the state, but domestic-incorporated insurance companies were subject to the state corporate income tax under § 57–38–30, N.D.C.C. This tax was assessed on "taxable income" at a graduated rate of between 2 percent and 7 percent. Foreign insurance companies that were assessed the gross premiums tax were not subject to the state corporate income tax because of an exemption provided for them under former § 57–38–09(15), N.D.C.C. [amended and reenacted by 1983 N.D.Sess. Laws Ch. 631, § 1]. Insurance companies organized under the laws of this state were also subject to a business and corporation

---

**2.** North Dakota's gross premiums tax statute was amended and reenacted by the 1983 Legislature as follows:

"26.1–03–17. *Commissioner to collect premium tax—Insurance companies generally—Computation—Credits—Penalty.*

"1. Before issuing the annual certificate required by law, the commissioner shall collect from every stock and mutual insurance company, nonprofit health service corporation, health maintenance organization, and prepaid legal service organization, except a fraternal benefit society, doing business in this state, a tax on the gross amount of premiums, assessments, membership fees, subscriber fees, policy fees, and finance and service charges received in this state during the preceding calendar quarter, at the rate of two percent with respect to life insurance, one-half of one percent with respect to accident and sickness insurance, and one percent with respect to all other lines of insurance. This tax does not apply to considerations for annuities. The tax is payable on or before the sixtieth day after the last day of the calendar quarter and shall be deposited in the general fund in the state treasury."

Section 26.1–03–17, N.D.C.C., also underwent amendments during the 1985 Legislative Session. *See* 1985 N.D.Sess.Laws Ch. 317, § 10 and Ch. 318, § 1.

privilege tax of 1 percent of net taxable income [§ 57–38–66, N.D.C.C., repealed by 1979 N.D.Sess.Laws Ch. 612, § 3], and the Vietnam bonus surtax which imposed a graduated tax of between $10 and $25 on domestic corporations for the tax years 1972 through 1974 [§ 57–38–30.2(2), N.D. C.C., repealed by 1975 N.D.Sess.Laws Ch. 476, § 2].

In *Western & Southern Life Ins. Co. v. State Board of Equalization of California*, 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), the United States Supreme Court, in upholding California's imposition of a retaliatory tax on foreign insurance companies, rejected a line of cases exemplified by *Lincoln National Life Ins. Co. v. Read*, 325 U.S. 673, 65 S.Ct. 1220, 89 L.Ed. 1861 (1945), which held that a state may impose a more onerous tax on foreign corporations for the "privilege" of doing business in the state without any requirement of a rational relationship between the tax and a legitimate state purpose. The Court stated:

> "In view of the decisions of this Court both before and after *Lincoln National*, it is difficult to view that decision as other than an anachronism. We consider it now established that, whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Western & Southern*, 451 U.S. at 667–668, 101 S.Ct. at 2083, 68 L.Ed.2d at 530.

The State first asserts that the district court erred in determining that North Dakota placed a more onerous tax burden on foreign companies than was placed on domestic companies by virtue of the gross premiums tax. This contention is without merit.

■ During the trial, the district court admitted into evidence documents indicating the amount of gross premiums taxes paid by the four plaintiffs for the years 1971 through 1980. The plaintiffs also introduced hypothetical North Dakota corporate income and business and privilege tax returns for the corresponding years. These hypothetical tax returns were introduced through the testimony of tax accountants from each company and indicated the amount of taxes each plaintiff would have paid if it had been taxed as a North Dakota-incorporated insurance company. The plaintiffs' federal income tax returns were used as a basis for computing the hypothetical North Dakota taxes, in addition to other business and accounting records of the plaintiffs.[3]

■ The trial testimony based on these documents established that the gross premiums tax places a tax burden on foreign-incorporated companies that is far in excess of the amount the companies would have paid under the North Dakota corporate income, corporate business and privilege, and Vietnam bonus surtaxes applicable to North Dakota-incorporated companies. The record establishes that between 1971 and 1980, Massachusetts Mutual Life Insurance Company paid $223,247 more in gross premiums taxes than if it had been taxed as a North Dakota company. Between 1975 and 1980, Prudential Property and Casualty Insurance Company paid $75,063 more than if it had been taxed as a

**3.** The State asserts that the hypothetical state income and business and privilege tax returns were inadmissible in the proceedings because they were improperly prepared, constituted hearsay, and were not the best evidence of the companies' business records.

We agree with the district court's observation that the State "neither seriously discredited the reasonable accuracy of the returns on cross-examination nor did they offer any rebuttal testimony that would establish their lack of reliability or relevancy." We conclude that the returns constituted reports or compilations prepared by expert accountants as illustrative of their calculations of the foreign companies' hypothetical state income and business and privilege tax liability, and, as such, were admissible under Rules 702, *et seq.*, and 1006, N.D.R.Ev.

domestic company during the same period of time. Prudential Insurance Company of America paid $1,696,560 more than it would have if taxed as a domestic company between 1971 and 1980. Between 1970 and 1980, Metropolitan Life Insurance Company paid $605,033 more than it would have if it had been taxed as a domestic company.[4]

4. The discriminatory nature of the gross premiums tax is also evidenced by the figures for the 1981 tax year. In order to make the record complete with regard to the plaintiffs' claims for refunds for the 1981 tax year, the parties entered into the following stipulation:

"Based on information provided by an employee of the North Dakota Commissioner of Insurance taken from the public records of the North Dakota Insurance Department, the parties stipulate that the table below sets forth the amount of premium tax paid under protest by each of the appellants/cross-appellees for the year 1981. For comparison purposes, the column in the table below captioned "Pro Forma Income Taxes" contains appellants'/cross-appellees' calculations of the North Dakota income taxes that they would have paid for the year 1981 if they had been taxed as North Dakota domestic insurance companies.

Such income taxes were calculated in the same manner as other pro forma income taxes appearing in the record for earlier years. These figures have not been verified by the North Dakota Tax Department.

| State of Domicile | Company | 1981 Premium Tax Paid | 1981 Pro Forma Income Tax |
|---|---|---|---|
| CT | Aetna Casualty & Surety Co. | 38,774 | –0– |
| CT | Aetna Life Insurance Co. | 72,331 | 5,473 |
| CT | Auto. Ins. Co. of Hartford | –0– | 20 |
| CT | Connecticut Mutual Life Ins. Co. | 2,558 | 80 |
| NY | Equitable Life Assurance Society | 145,839 | –0– |
| MA | John Hancock Mutual Life | 36,114 | 635 |
| NY | Manhattan Life Ins. Co. | 3,202 | 28 |
| MA | Massachusetts Mutual Life | 46,455 | 3,243 |
| NY | Metropolitan Life Ins. Co. | 40,085 | 4,189 |
| NY | Mutual Life Ins. Co. of N.Y. | 21,292 | 1,502 |
| NY | New York Life Ins. Co. | 162,371 | 9,732 |
| NJ | Prudential Ins. Co. of America | 301,086 | 15,627 |
| NJ | Prudential Prop. & Cas. Ins. Co. | 18,995 | –0– |
| CT | Standard Fire Ins. Co. | 3,164 | 166 |
| CA | Transamerica Life & Annuity Co. | 529 | 112 |
| CA | Transamer. Occidental Life Ins. Co. | 55,456 | 23 |
| | TOTAL 1981 PREMIUM TAX PAID | $948,251 | |
| | TOTAL 1981 PRO FORMA INCOME TAX | | $40,830 |

"It is further stipulated that for the year 1981, $10,215,869 in premium taxes were paid by 986 foreign insurance companies. Of those companies, 296 wrote $1000 of premiums or less in North Dakota, and hence paid $25 or less in premium taxes for the year 1981.

"It is further stipulated that 34 other foreign insurance companies, which are not parties to this appeal, filed protests for 1981. These 34 companies paid total 1981 North Dakota premium taxes of $899,241.

"It is further stipulated that 11 other companies either asked for refunds of premium taxes for prior years or for the year 1981, which might be construed as a payment under protest for 1981. The total of 1981 premium taxes paid by these 11 companies was $366,755.

"It is further stipulated that the Affidavit of J.O. Wigen executed on the 12th day of March, 1982, in support of the defendants' motion for partial summary judgment, in paragraphs IV, VII and VIII thereof, recites the payment under protest of premium taxes for the year 1980 by Metropolitan Life Insurance Company, Prudential Insurance Company of America and Prudential Property and Casualty Insurance Company, respectively. These payments were as follows:

The State's expert economist admitted on cross-examination that the effective North Dakota income tax rate on gross corporate receipts is .02 percent. Comparing the two tax rates, he estimated that foreign insurance companies paid at a rate as much as 125 times higher than domestic insurance companies.

To argue, as does the State, that when looking at the tax system as a whole in computing the relative tax burdens, the burden on the foreign companies was not unduly significant or discriminatory, ignores the realities of the situation. There is no question that the North Dakota statutory scheme for taxing insurance companies placed a more onerous burden on foreign-incorporated companies than was placed on domestic-incorporated companies, and that it did so based solely on the place of incorporation of the taxpayer.

█ We next determine whether or not "the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Western & Southern, supra,* 451 U.S. at 668, 101 S.Ct. at 2083, 68 L.Ed.2d at 530. This necessitates a twofold inquiry: "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose? *Western & Southern, supra.*

In *Metropolitan Life Ins. Co. v. Ward,* — U.S. —, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), the United States Supreme Court was presented the question whether or not Alabama's domestic preference tax statute, which taxed foreign insurance companies at a higher rate than domestic insurance companies, violated the Equal Protection Clause. In *Ward,* several foreign insurance companies sought a judgment declaring the Alabama tax unconstitutional and requiring the Commissioner of Insurance to make appropriate refunds. On cross-motions for summary judgment, a state circuit court ruled that the statute was constitutional because it served " 'at least two purposes, in addition to raising revenue: (1) encouraging the formation of new insurance companies in Alabama, and (2) encouraging capital investment by foreign insurance companies in the Alabama assets and governmental securities set forth in the statute.' " *Ward, supra,* — U.S. at —, 105 S.Ct. at 1679, 84 L.Ed.2d at 756. The state court of civil appeals affirmed the circuit court's rulings as to the existence of the two legitimate state purposes, but remanded for an evidentiary hearing on the issue of rational relationship. The foreign companies waived their right to a hearing on the rational relationship issue, and requested a final determination from the Alabama Supreme Court on the legitimate purpose issue. The Alabama Supreme Court ultimately entered a final judgment in favor of the State, and the companies appealed to the United States Supreme Court.

The Supreme Court reversed, holding by a 5-4 majority that promotion of domestic business by imposing a discriminatory tax against nonresident competitors, and that encouraging investment in state assets and securities through imposition of a discriminatory tax, are not legitimate state purposes under the Equal Protection Clause. The Supreme Court did not invalidate Ala-

| State of Domicile | Company | 1980 Premium Tax Paid |
|---|---|---|
| NY | Metropolitan Life Ins. Co. | 73,906 |
| NJ | Prudential Ins. Co. of America | 253,781 |
| NJ | Prudential Prop. & Cas. Ins. Co. | 18,726 |
| | TOTAL 1980 PREMIUM TAX PAID | $346,413" |

During oral arguments before this court, plaintiffs' counsel stated that, with regard to the four companies that went to trial, the difference between the amount of gross premiums taxes paid and the amount that would have been assessed if they had been taxed as North Dakota-incorporated companies for the tax years 1971 through 1980, totals $2,574,847.

bama's domestic preference tax statute, but because of the procedural posture of the case, remanded for further proceedings in which "the State will be free to advance again its arguments relating to the legitimacy" of 15 additional purposes advanced in support of the Alabama statute. *Ward, supra,* —— U.S. at —— n. 5, 105 S.Ct. at 1680 n. 5, 84 L.Ed.2d at 758 n. 5.

In the present case, the State has advanced 23 purposes in support of § 26–01–11(1), N.D.C.C. A list of six proposed legislative motives or purposes was presented by the State's expert economist. The State's brief lists 17 other possible legislative purposes. The district court ruled that "[t]o the extent that any of the ... purposes advanced by defendants were considered by the legislature they are either not legitimate or are not rationally related to the achievement of a legitimate state purpose."[5]

The vast majority of the purposes presented by the State, and upon which the State relied most heavily in the district court, relate to promotion of the domestic insurance industry within the state and encouragement of capital investment in the state. Both of these purposes were determined by the Supreme Court in *Ward* not to be legitimate under the Equal Protection Clause when furthered by discrimination.

The State has not specifically directed our attention to any particular one of the remaining purposes which it believes might survive equal protection analysis after the Supreme Court's decision in *Ward.* In any event, the five purposes we discern not to be directly related on their face to the purposes invalidated in *Ward* are that the gross premiums tax: (1) "Serves in lieu of a tax on revenues received by foreign insurance companies as a result of reinsurance arrangements with domestic companies;" (2) "Compensates North Dakota for benefits received by foreign insurance com-

panies as a result of government services provided by North Dakota and its political subdivisions;" (3) "Equalizes the burden which the tax system as a whole imposes upon domestic and foreign insurance companies in North Dakota;" (4) "Simplifies and eases the administration of tax and insurance laws;" and (5) "Encourages foreign insurers to transact business in the state."

If, under *Ward,* promoting domestic business and encouraging capital investment are not legitimate state purposes when furthered by discrimination, we are unable to perceive how the above-mentioned purposes can be construed as sustaining the gross premiums tax when viewed in light of its excessively discriminatory nature.

■ The first purpose advanced by the State rests upon the premise that reinsurance premiums received by foreign insurance companies should be subject to taxation while those received by domestic insurance companies should not be subject to taxation. We agree with the plaintiffs that advancing this purpose as a justification for the discriminatory gross premiums tax is "tantamount to advancing discrimination as a purpose to be accomplished by discrimination."

■ Purposes 2 and 3 are somewhat interrelated. Purpose 2 implies that foreign insurance companies should be required to pay a gross premiums tax, just as domestic insurance companies are required to pay income taxes, as compensation for services rendered by the state and its political subdivisions. We first note that in order to qualify for the exemption from the gross premiums tax, a company need not be domiciled within the state, but need only be incorporated under state law. Although the State has not specified what these services might be, it can logically be assumed

---

**5.** The district court indicated in its memorandum opinion that because the only purpose articulated by the Legislature in 1897 for enacting the gross premiums tax was to raise revenue [*see* 1897 N.D.Sess.Laws Ch. 94, § 2], it was limited to considering that purpose alone. We

need not determine whether or not the district court was correct in this regard because of our conclusions that none of the purposes advanced by the State are legitimate and that the gross premiums tax is not, in any event, rationally related to achievement of those purposes.

that foreign insurance companies receive no more in the way of such services than do domestic insurance companies. Purpose 3 similarly implies that the gross premiums tax is imposed on foreign companies to equalize the tax burden on all companies because domestic companies must pay corporate income taxes while foreign companies do not. The flaw in these arguments is that the tax burdens are far from equal, and foreign companies are taxed at a rate significantly higher than domestic companies. To call this "equalizing the tax burden" under these circumstances is a misnomer. The excess burden imposed upon the foreign companies through this discriminatory taxing scheme cannot conceivably be construed as contributing to the accomplishment of these purposes.

■ With regard to purpose 4, we fail to see any legitimacy in the contention that the discriminatory gross premiums tax "simplifies and eases the administration of tax and insurance laws." Uniform tax treatment of both classes of companies would seem to be the rational means to achieve this purpose.

■ Assuming for purposes of argument that encouraging foreign companies to transact business in the state is a legitimate purpose, it is difficult to comprehend how a tax scheme which significantly discriminates against foreign companies conceivably could have been believed to achieve that purpose.

■ We conclude that none of the purposes advanced by the State are legitimate when furthered by discrimination, or if legitimate, that the tax is not rationally related to the achievement of those purposes. Especially in light of the United States Supreme Court decision in *Ward*, we hold that North Dakota's pre-1983 gross insurance premiums tax bears no rational relationship to a legitimate state purpose and

therefore violates the Equal Protection Clauses of the Federal and State Constitutions.[6]

## II

## TAX REFUNDS

Our next inquiry is whether or not the district court erred in denying the foreign insurance companies' claims for refunds of the gross premiums taxes paid in the past. In denying the claims for refunds, the district court relied on principles of sovereign immunity, voluntary payment, laches, and windfall profit. The court also applied the "*Sunburst* Doctrine," giving the ruling pure prospective effect as of the date of the recording of the judgment. We need not address all of the bases given for the district court's denial of tax refunds, because we agree that under the circumstances, equitable considerations favor giving this decision pure prospective effect.

Prospective application of judicial rulings, or the "*Sunburst* Doctrine" [*Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)], has been utilized by this court in various forms on several occasions. We have applied our rulings to future cases only, excluding the case before us [*Soo Line Railroad Co. v. State*, 286 N.W.2d 459 (N.D.1979); *Walker v. Omdahl*, 242 N.W.2d 649 (N.D.1976)], and to future cases as well as the case before us [*Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974); *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974)].

The United States Supreme Court has on many occasions held civil legislation unconstitutional and given only prospective effect to its holding in order to avoid the imposition of undue administrative or financial burdens on agencies of government. *E.g., Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50,

---

**6.** In our view the United States Supreme Court in *Ward* seems to have departed from the latitude it not so long ago afforded state legislative discretion in determining what discrimination is appropriate. But *Ward* is the latest pronouncement of our highest court and, accord-

ingly, we must apply it. *See North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973); *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy*, 219 N.W.2d 140 (N.D.1974).

102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *Lemon v. Kurtzman (Lemon II)*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

The Supreme Court's decision in *Lemon II, supra,* is instructive. In *Lemon v. Kurtzman (Lemon I)*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court held that a Pennsylvania statute under which the state reimbursed private sectarian schools for secular educational services was unconstitutional. After *Lemon I* was decided, an issue arose regarding the propriety of the state's payment for services rendered by the institutions before the date of the Supreme Court's opinion declaring the law unconstitutional. The Federal District Court enjoined payments for services rendered after the Supreme Court's decision in *Lemon I,* but permitted the state to pay $24,000,000 to the schools for services provided before the decision in *Lemon I* was rendered.

The Supreme Court affirmed, stating:
"The process of reconciling the constitutional interests reflected in a new rule of law with reliance interests founded upon the old is 'among the most difficult of those which have engaged the attention of courts, state and federal....' *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 374, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940). Consequently, our holdings in recent years have emphasized that the effect of a given constitutional ruling on prior conduct 'is subject to no set "principle of absolute retroactive invalidity" but depends upon a consideration of "particular relations ... and particular conduct ... of rights claimed to have become vested, of status, of prior determinations deemed to have finality"; and "of public policy in the light of the nature both of the statute and of its previous application." ' *Linkletter [v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965) ], quoting from *Chicot County*

*Drainage Dist., supra,* 308 U.S., at 374, 60 S.Ct., at 319 .... [S]tatutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. Appellants offer no persuasive reason for confining the modern approach to those constitutional cases involving criminal procedure or municipal bonds, and we ourselves perceive none." *Lemon II, supra,* 411 U.S. at 198–199, 93 S.Ct. at 1468, 36 L.Ed.2d at 160.

The Court stated that the problem essentially related to "the appropriate scope of federal equitable remedies, a problem arising from enforcement of a state statute during the period before it had been declared unconstitutional," and that "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon II, supra,* 411 U.S. at 199, 200, 93 S.Ct. at 1469, 36 L.Ed.2d at 161 [Footnote omitted]. The Court noted that "reliance interests weigh heavily in the shaping of an appropriate equitable remedy" [*Lemon II, supra,* 411 U.S. at 203, 93 S.Ct. at 1471, 36 L.Ed.2d at 163], and added:

"Appellants ask, in effect, that we hold those charged with executing state legislative directives to the peril of having their arrangements unraveled if they act before there has been an authoritative judicial determination that the governing legislation is constitutional. Appellants would have state officials stay their hands until newly enacted state programs are 'ratified' by the federal courts, or risk draconian, retrospective decrees should the legislation fall. In our view, appellants' position could seriously undermine the initiative of state legislators and executive officials alike. Until judges say otherwise, state officers ... have the power to carry forward the directives of the state legislature. Those officials may, in some circumstances, elect to defer acting until an authoritative judicial pronouncement has been

secured; but particularly when there are no fixed and clear constitutional precedents, the choice is essentially one of political discretion and one this Court has never conceived as an incident of judicial review. We do not engage lightly in post hoc evaluation of such political judgment, founded as it is on 'one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law.' *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, at 60, 93 S.Ct. 1278, at 1311, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring)." *Lemon II, supra,* 411 U.S. at 207–208, 93 S.Ct. at 1473, 36 L.Ed.2d at 165–166.

Giving pure prospective relief and thereby effectively denying refunds in cases holding state taxes or assessment procedures unconstitutional is not without precedent in this jurisdiction or in others. In *Soo Line Railroad Co., supra,* the appellant brought actions seeking an adjudication that its 1974, 1975, and 1976 property tax assessments were void and that the amounts of the tax paid in excess of the assessment which could lawfully have been levied should be refunded. Although we remanded to the Board of Equalization for redetermination of tax assessments for those years in accordance with Chapter 28–32, N.D.C.C., our holding that all tax assessments must be uniform until such time as the Legislature provides for classification of different levels of property, was given pure prospective effect beginning with 1981 property tax assessments.

In *Hurd v. City of Buffalo,* 41 A.D.2d 402, 405, 343 N.Y.S.2d 950, 953 (1973), *aff'd,* 34 N.Y.2d 628, 311 N.E.2d 504, 355 N.Y.S.2d 369 (1974), the court refused to require the city to repay taxes illegally collected under a statute violative of the state constitution because "the City has relied on the additional taxes which it was able to impose because of the statute, and has spent the revenues derived thereby." The city was also allowed to retain amounts of taxes paid under protest after the date of the lower court opinion holding the tax statute unconstitutional. *See Pell-nat v. City of Buffalo,* 59 A.D.2d 1038, 399 N.Y.S.2d 788 (1977).

The Arizona Supreme Court in *Southern Pacific Company v. Cochise County,* 92 Ariz. 395, 406, 377 P.2d 770, 778 (1963), also ruled that although the appellant's allegations of discriminatory tax assessments stated a valid claim for injunctive relief, no refund of taxes paid under written protest would be allowed because "taxing subdivisions of the state have long predicated their fiscal affairs upon the practices alleged" in the complaint and "[t]he refund which appellant seeks together with other similar claims threatens the financial solvency of many taxing units of the state, particularly those in rural and undeveloped areas."

In *Jacobs v. Lexington-Fayette Urban County Government,* 560 S.W.2d 10 (Ky. 1977), the court reached a similar conclusion. Although the court held that a differential in tax rates insofar as they applied to personal property and severed mineral interests violated the state constitution, it refused to deprive the local government of its tax revenues where it reasonably could have relied on a previous judicial opinion indicating that the tax was constitutional and because it "would be unjust and constitute a hardship upon all citizens of that local government." *Jacobs, supra,* 560 S.W.2d at 14.

The Supreme Court of Florida also refused to order tax refunds totaling $7,300,000 after invalidating a statute authorizing school districts to levy an ad valorem tax in excess of 10 mills without a vote of the electors. The court in *Gulesian v. Dade County School Board,* 281 So.2d 325 (Fla. 1973), reasoned that pure prospective application of the ruling was proper because of the school board's good faith reliance on a presumptively valid statute and the budgetary and administrative burdens a refund would cause. *See also Intern. Studio Apartment Ass'n v. Lockwood,* 421 So.2d 1119 (Fla.Dist.Ct.App.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 244, 78 L.Ed.2d 233 (1983).

Invalidating statutory sections establishing a sales tax differential for border counties, the Supreme Court of Washington also held that its opinion would be given only prospective effect beginning January 1 of the following year because "[r]etroactive application of the present decision would impose a substantial hardship on the retailers in the border counties" and the court would "not impose such a burden upon the retailers that cannot legally be passed on to the buyers." *Bond v. Burrows,* 103 Wash.2d 153, 164, 690 P.2d 1168, 1174 (1984).

·We find particularly persuasive the New Jersey Supreme Court's decision in *Salorio v. Glaser,* 93 N.J. 447, 461 A.2d 1100, *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). In *Salorio,* the court held that the New Jersey Emergency Transportation Tax Act (ETT), which essentially levied a higher tax on New Jersey-derived income of New York residents who commuted to work in New Jersey, violated the Privileges and Immunities Clause of the United States Constitution. The plaintiffs had sought declaratory and injunctive relief and damages based on the amount of ETT taxes they had paid. In its decision dated June 8, 1983, the court not only denied the plaintiffs reimbursement for taxes previously paid, but applied the decision prospectively only with respect to income earned on and after January 1, 1984. The court reasoned that fixing a prospective date for its decision was proper because of the "fiscal and administrative problems that would be engendered if the State were compelled to surrender ETT receipts before the end of the fiscal year," and in order to allow the state a "reasonable period of time to devise alternative revenue raising methods, abandon or postpone transportation projects or consider some other suitable solutions." *Salorio, supra,* 93 N.J. at 467, 461 A.2d at 1111.

The court justified its refusal to grant reimbursement of the taxes illegally collected by noting the following factors: the court's holding with regard to the constitutionality of the ETT was the equivalent of a new rule of law; the state justifiably

relied upon the availability of the ETT funds because of the presumptive validity of the statute; no one judicially challenged the ETT until June 1977, fifteen years after the ETT was enacted; the plaintiffs suffered virtually no financial harm because they received a credit for the amount paid to New Jersey against their New York income tax; and "[p]ublic fiscal stability is at issue." *Salorio, supra,* 93 N.J. at 465, 461 A.2d at 1110.

■ Many of the same factors are present in this case. We have consistently stated that an enactment of the Legislature is entitled to a presumption of constitutional validity. *E.g., State ex rel. Lesmeister v. Olson,* 354 N.W.2d 690, 694 (N.D.1984). We believe that the ruling in this case, based as it is on the United States Supreme Court's recent decision in *Ward,* is the equivalent of a new principle of law. Justice O'Connor, in a vigorous dissent in the *Ward* decision, essentially recognized the majority's holding as such. The Justice characterized the majority's holding as "astonishing" and an "unfortunate adventure away from the safety of our precedents...." *Ward, supra,* —— U.S. at ——, —— 105 S.Ct. at 1684, 1694, 84 L.Ed.2d at 763, 775 (O'Connor, J., dissenting.)

■ The State's reliance in the past on the constitutionality of the gross premiums tax was certainly justifiable in view of decisions such as *Lincoln National Life Ins. Co. v. Read,* 325 U.S. 673, 65 S.Ct. 1220, 89 L.Ed. 1861 (1945). We do not believe that the 1981 *Western & Southern* decision so clearly foreshadowed the outcome of *Ward* and the present case that the State's reliance on the validity of the tax was unjustified after that decision was rendered. In arriving at its decision in *Ward,* the majority found it necessary to distinguish the *Western & Southern* decision from the case before it. We note also that three of the justices who joined the majority opinion in *Western & Southern,* including its author, Justice Brennan, joined Justice O'Connor's dissent in *Ward.* We believe that the State was entitled to rely on the presump-

tive validity of the gross premiums tax and that such reliance remained justifiable after the date of the *Western & Southern* decision.[7]

We also find it relevant that the Legislature acted promptly upon the district court's invalidation of the gross premiums tax in 1983. Rather than await the final outcome of an appeal, the Legislature eliminated the discriminatory nature of the tax and made the amendment retroactive to the prior tax year.

Also significant is that the pre-1983 gross premiums tax was first enacted in 1897. The plaintiffs paid the tax without any discernible protest until the *Western & Southern* decision was rendered in 1981. We also agree with the district court's observation that any financial harm suffered by the plaintiffs by virtue of their payment of the tax is negligible at best. The district court stated in its memorandum opinion that an "undisputed fact in this case is that the bulk of the cost of the gross premium tax is passed on by Plaintiffs to their customers" in the form of higher insurance premiums. This determination is amply supported by the record. Rule 52(a), N.D. R.Civ.P. Although the testimony and reports of the expert economists differed as to the degree of "forward shifting" of the cost to consumers, both agreed that it occurs. Although this consideration may not in itself be sufficient to deny a refund of taxes illegally collected [*see William Clairmont, Inc. v. State*, 261 N.W.2d 780, 785 (N.D.1977)], we believe it properly may be taken into account in weighing the equities to determine whether or not a decision should be given retrospective or prospective application.

The legislative and executive branches of state government relied on the gross premiums tax for decades in preparing budgets and making appropriations and expenditures. This reliance was justified by the presumptive validity of the tax statute. As the court in *Salorio* noted, the expenditures made from this revenue during the many years for which refunds are sought cannot be undone, and reimbursement at this point would pose a significant hardship upon the state's existing financial requirements.

Having weighed the equities in this case, we conclude that the district court properly gave its ruling pure prospective application, thereby effectively denying the plaintiffs' claims for refunds.[8]

For the reasons stated in this opinion, the judgments are affirmed.

VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

PEDERSON, Surrogate Justice, sitting in place of LEVINE, J., disqualified.

PEDERSON, Surrogate Justice, dissenting.

Because I perceive that economic subsidies for an industry, for a synthetic fuels plant, for an airline company, for a depressed locality, and for a domestic insurance company are non-invidious discriminations, I need no help from expert economists in the form of articulated purposes to conclude that there is a legitimate state purpose in exempting local companies from the insurance premium tax.

I would reverse the district court's determination that Section 26-01-11(1), NDCC is unconstitutional and thereby afford the United States Supreme Court an opportunity to reconsider the error it has made.

---

7. Accordingly, we find no compelling reason to distinguish the taxes paid under protest from those not paid under protest for the purpose of determining whether or not this decision should be given prospective or retrospective effect. *See Southern Pacific Company v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963); *Pellnat v. City of Buffalo*, 59 A.D.2d 1038, 399 N.Y.S.2d 788 (1977).

8. Because we have determined that the district court correctly gave its ruling in district court case numbers 31,865 and 31,866 pure prospective effect as of the date of entry of judgment, it is unnecessary to decide whether or not the reasons given for dismissal of case number 33,-327, *i.e.*, res judicata, collateral estoppel, and merger and bar, were proper.