BRISCOE, Chief Judge,
concurring in part and dissenting in part, joined by LUCERO, Circuit Judge.
In its eagerness to afford rights under the Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause of the First Amendment to Hobby Lobby and Mardel, the majority ignores the fundamental components upon which sound judicial decisionmaking is grounded: evidence, of which plaintiffs presented none; burdens of persuasion, which indisputably rest on the plaintiffs but which the majority effectively imposes on the defendants; and precedent, of which there is none to support the plaintiffs’ novel claims under RFRA, or the new class of corporations effectively recognized by the majority. I therefore dissent from the majority’s conclusion that Hobby Lobby and Mardel have established a substantial likelihood of success on the merits of their RFRA claims, and the majority’s concomitant decision to reverse the district court’s denial of plaintiffs’ motion for preliminary injunctive relief.

*1164
I. The Anti-Injunction Act

Regarding the threshold question of the applicability of the Anti-Injunction Act (AIA), three judges would have us take the unnecessary step of concluding that the AIA is not jurisdictional, but instead a waivable, non-jurisdictional “claims processing rule.” Gorsuch Op. at 1157, 1158. In my view, it is sufficient simply to conclude, as everyone agrees, that the AIA does not apply to the RFRA claims asserted by Hobby Lobby and Mardel, and to leave the jurisdictional/nonjurisdictional question (which neither side has raised) for another case in which it matters. See generally Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. —, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (Scalia, J., dissenting) (“The values that should have determined our course today are caution [and] minimalism....”). I therefore concur in the conclusion that the AIA does not bar the RFRA claims at issue in this appeal.

II. The Record on Appeal

Section I of the majority opinion purports to outline the “Background & Procedural History” of this case, including a description of the plaintiffs and their businesses, and the types of drugs and devices mandated under the challenged contraceptive-coverage regulation. Reading this section, one would think either that the government had admitted all of the allegations in plaintiffs’ complaint, or, more likely, that the plaintiffs had presented a wealth of evidence at the preliminary injunction hearing to support those allegations. But as it turns out, neither is true. At the hearing on plaintiffs’ motion for preliminary injunction, plaintiffs presented no evidence of any kind. And, although the government opposed plaintiffs’ motion for preliminary injunction, it never had an opportunity to file an answer to plaintiffs’ complaint. That is because, shortly after the district court denied plaintiffs’ motion for preliminary injunction, the district court proceedings were stayed pending the outcome of this appeal.
As a result, we know very little about any of the important facts of this case. For example, although the allegations in plaintiffs’ complaint touch on certain aspects of the structure and operation of the two corporate plaintiffs, we do not know, even assuming the truth of those allegations, precisely how each corporation was established, how it is structured, or how it is operated. Relatedly, plaintiffs presented no evidence attempting to demonstrate whether or how Hobby Lobby and Mardel hold religious beliefs, and whether or how these corporate plaintiffs, which collectively operate hundreds of retail stores and employ thousands of employees, exercise religion. In turn, plaintiffs presented no evidence indicating how the contraceptive-coverage regulation would burden Hobby Lobby’s and Mardel’s religious beliefs. Lastly, there is no evidentiary support in the record for plaintiffs’ allegations that the objected-to contraceptive drugs and devices actually have the potential to prevent implantation of fertilized eggs. To be sure, a review of the briefs filed in this case suggests there is agreement among the parties and amici that intrauterine devices have such potential. But the same cannot be said about the challenged contraceptive drugs (e.g., Plan B and Ella). See Tummino v. Hamburg, — F.Supp.2d —, —, 2013 WL 1348656, at *1 (E.D.N.Y. Apr. 5, 2013) (finding that levonorgestrel-based emergency contraception, such as Plan B and Plan B One-Step, interfere with pre fertilization events and have not been shown to interfere with implantation of a fertilized egg).
In light of these evidentiary deficiencies, I fail to see how plaintiffs could reasonably be said to have carried their burden of establishing their entitlement to a preliminary injunction. And, relatedly, I am *1165 concerned, given these evidentiary deficiencies, about the majority’s eagerness to issue seemingly definitive rulings on the merits of plaintiffs’ novel claim that for-profit corporations are entitled to coverage under RFRA. See generally Kennedy v. Silas Mason Co., 334 U.S. 249, 256-57, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948) (“noting that “summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation”).

III. Are Hobby Lobby and Mardel Persons Exercising Religion Under RFRA?

In the first part of its merits analysis, the majority addresses the question of whether Hobby Lobby and Mardel qualify as “persons exercising religion for purposes of RFRA.” Maj. Op. at 1128. As I shall outline below, the majority makes a number of critical mistakes in doing so. And its ultimate holding, which is unprecedented, is sufficiently ambiguous that neither the majority nor anyone else can confidently predict where it may lead, particularly when one considers how easily an “exercise of religion” could now be asserted by a corporation to avoid or take advantage of any governmental rule or requirement.
A.
The majority begins its analysis by suggesting that Hobby Lobby has a “religious mission.” Id. The majority also notes, and effectively adopts, the plaintiffs’ characterization of the two corporations as “faith-based compan[ies].” Id. at 1122.
These characterizations, however, find meager support in the factual record, and virtually no support in federal or state law. The certificates of incorporation for both Hobby Lobby and Mardel were submitted to the district court as exhibits to the defendants’ brief in opposition to plaintiffs’ motion for preliminary injunction and are now part of the joint appendix in this appeal. Notably, there is not a single reference to religion in either certificate. Instead, the certificates state simply that Hobby Lobby and Mardel were created for the purpose of “engaging] in any lawful act or activity for which corporations may be organized under the Oklahoma General Corporation Act.” JA at 162a, 166a. Consistent with these certificates, the plaintiffs’ complaint concedes that both Hobby Lobby and Mardel are “privately held, for-profit corporations^] ... organized under Oklahoma law.” Id. at 18a. More specifically, the complaint alleges that Hobby Lobby operates approximately 514 craft stores in the United States, selling “a variety of art and craft supplies, home decor, and holiday decorations.” Id. at 20a. As for Mardel, the complaint alleges that it is “a bookstore and educational supply company that specializes in Christian materials, such as Bibles, books, movies, apparel, church and educational supplies, and homeschool curricula.” Id. at 21 a. Assuming the truth of these allegations, Hobby Lobby and Mardel are, in a nutshell, for-profit businesses focused on selling merchandise to consumers.
To be sure, plaintiffs allege in their complaint that “Hobby Lobby’s statement of purpose reads:
In order to effectively serve our owners, employees, and customers the Board of Directors is committed to:
Honoring the Lord in all we do by operating the company in a manner consistent with Biblical principles.
Offering our customers an exceptional selection and value.
Serving our employees and their families by establishing a work environment and company policies that build *1166 character, strengthen individuals, and nurture families.
Providing a return on the owners’ investment, sharing the Lord’s blessings with our employees, and investing in our community.
We believe that it is by God’s grace and provision that Hobby Lobby has endured. He has been faithful in the past, we trust Him for our future.”
Id. at 22a-23a. The complaint also alleges that “[t]he Green family’s business practices ... reflect their Christian faith in unmistakable and concrete ways.” Id. at 14a. For example, they allege that “[t]hey give millions of dollars from their profits to fund missionaries and ministries around the world,” and “they close all their stores on Sundays, even though they lose millions in annual sales by doing so.” Id.
But these alleged facts, though perhaps establishing a sincerity of purpose on the part of the Green family that is rooted in their faith, cannot alter the basic for-profit status of the two corporations, or otherwise place these corporations into a unique class for purposes of RFRA in particular, or federal or state law in general. Significantly, the majority, despite employing the unique characterizations of “faith-based companies” and businesses with “a religious mission,” does not cite to a single source in support of this new legal category of for-profit corporation.
That is because it cannot. As far as I can determine, neither the United States Supreme Court nor any federal circuit court, until now, has ever used the phrase “faith-based company,” let alone recognized such a distinct legal category of for-profit corporations. Nor, as far as I can tell, has the United States Supreme Court or any federal circuit court, until now, recognized a for-profit corporation as having a “religious mission.” Finally, Oklahoma state law, under which Hobby Lobby and Mardel were formed and currently exist, does not recognize any such unique class of corporation.
B.
The majority concludes that Hobby Lobby and Mardel are “persons” for purposes of RFRA. Maj. Op. at 1128-33. In reaching this conclusion, the majority correctly notes that “RFRA contains no special definition of ‘person.’ ” Id. at 1129. The majority thus turns to “the Dictionary Act, which instructs: ‘In determining the meaning of any Act of Congress, unless the context indicates otherwise * * * the word[ ] “person” ... include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.’ ” Id. (quoting 1 U.S.C. § 1). The majority then cites Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006), which involved RFRA claims raised by a New Mexico-based religious sect organized as a non-profit corporation. Relying on 0 Centro, the majority asserts that “the Supreme Court has affirmed the RFRA rights of corporate claimants, notwithstanding the claimants’ decision to use the corporate form.” Maj. Op. at 1129. Proceeding on the assumption that “at least some types of corporate entities can bring RFRA claims,” the majority then asks “whether Congress intended to exclude for-profit corporations, as opposed to nonprofit corporations, from RFRA’s scope.” Id. at 1129. Ultimately, the majority concludes that Congress “chose not to do so in RFRA,” id., and that, instead, “Congress meant ‘person’ in RFRA to [carry] ... its default meaning in the Dictionary Act— which includes corporations regardless of their profit-making status,” id. at 1132.
The problem, however, is that the majority fails to properly recognize that “the context [of RFRA, including its legislative *1167 history,] indicates otherwise,” 1 U.S.C. § 1, and thus it is unreasonable to assume from Congress’s silence that Congress anticipated that for-profit corporations would be covered as “persons” under RFRA. RFRA, as the majority notes, was enacted by Congress in response to the Supreme Court’s decision in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which construed the Free Exercise Clause of the First Amendment to hold that “neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.” City of Boerne v. Flores, 521 U.S. 507, 514, 117 S.Ct. 2157, 188 L.Ed.2d 624 (1997). In Congress’s view, “the compelling interest test as set forth in [pre-Smith ] Federal court rulings [wa]s a workable test for striking sensible balances between religious liberty and competing prior governmental interests.” 42 U.S.C. § 2000bb(a)(5). Thus, RFRA was intended “to restore the compelling interest test ... and to guarantee its application in all eases where free exercise of religion is substantially burdened.” Id. § 2000bb(b)(l). In short, the purpose of RFRA was restoration of pre-Smith free exercise jurisprudence, not expansion of the scope of the Free Exercise Clause. See O Centro, 546 U.S. at 424, 126 S.Ct. 1211 (noting that Congress, by way of RFRA, “adopt[ed] a statutory rule comparable to the constitutional rule rejected in Smith.”)-, Vill. of Bensenville v. Fed. Aviation Admin., 457 F.3d 52, 62 (D.C.Cir.2006) (“[W]ith RFRA Congress intended to ‘restore’ the standard by which federal government actions burdening religion were to be judged, not to expand the class of actions to which the standard would be applied.”).
The relevant context, then, is the body of free exercise case law that existed at the time of RFRA’s passage. See Bruesewitz v. Wyeth LLC, — U.S. —, 131 S.Ct. 1068, 1082, 179 L.Ed.2d 1 (2011) (“When all (or nearly all) of the relevant judicial decisions have given a term or concept a consistent judicial gloss, we presume Congress intended the term or concept to have that meaning when it incorporated it into a later-enacted statute.”) (internal quotation marks omitted); Stewart v. Dutra Constr. Co., 543 U.S. 481, 490, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005) (examining “[t]he context surrounding the ... enactment” of the statute at issue); Rowland v. Calif. Men’s Colony, 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (holding that context includes “the texts of other related congressional Acts”).[1] And the proper inquiry is whether, at the time of RFRA’s passage, the Supreme Court had said anything about for-profit corporations possessing and exercising rights under the Free Exercise Clause of the First Amendment.[2] Plaintiffs, who carry the burden on *1168 this inquiry, provide us with no persuasive authority.[3] Indeed, they don’t even directly address this question. Not because they have overlooked precedent. But rather because none exists. At the time of RFRA’s passage, the Supreme Court had never addressed whether, let alone recognized that, a for-profit corporation possessed free exercise rights under the First Amendment. In other words, during the 200-year span between the adoption of the First Amendment and RFRA’s passage, the Supreme Court consistently treated free exercise rights as confined to individuals and non-profit religious organizations. E.g., Jimmy Swaggart Ministries v. Bd. of Equalization of Calif., 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (addressing free exercise claims asserted by religious organization); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding that the purpose of the Free Exercise Clause is “to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority.”) (emphasis added). And, in United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), decided approximately a decade prior to RFRA’s enactment, the Supreme Court emphasized that “[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.” Id. at 261, 102 S.Ct. 1051. In light of this body of precedent, the only reasonable conclusion we can draw is that Congress, in employing the term “person” in RFRA, anticipated that it would encompass only individuals and non-profit religious organizations.
The limitation of RFRA’s applicability to individuals and non-profit religious organizations is reinforced by examining the legislative history of RFRA. In discussing the “BACKGROUND AND NEED” for RFRA, Congress noted “that the right to *1169 observe one’s faith, free from Government interference, ... is enshrined in the free exercise clause of the first amendment.” Religious Freedom Restoration Act of 1993, S. Rep. 103-111 (1993), reprinted in 1993 U.S.S.C.A.N. 1892, 1893-94 (emphasis added). In turn, Congress recognized that “[t]his fundamental constitutional right may be undermined ... by governmental rules of general applicability which operate to place substantial burdens on individuals’ ability to practice their faiths.” Id. at 1894 (emphasis). Congress further stated that “[t]he extent to which the Free Exercise Clause requires government to refrain from impeding religious exercise defines nothing less than the respective relationships in our constitutional democracy of the individual to government and to God.” Id. at 1897 (emphasis added). Later, in discussing the intended purpose of RFRA and its impact on other areas of the law, Congress made explicit reference to “religious institutions” and “religious organizations.” Id. at 1898 (“The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions.”), 1902 (“the courts have long adjudicated cases determining the appropriate relationship between religious organizations and government.”). Entirely absent from the legislative history, however, is any reference to for-profit corporations. In short, Congress clearly recognized that individuals and religious organizations enjoy free exercise rights, and thus it anticipated that RFRA’s reach would extend to them. But nowhere is there any suggestion that Congress foresaw, let alone intended that, RFRA would cover for-profit corporations.
Consequently, it comes as no surprise that not a single case, until now, has extended RFRA’s protections to for-profit corporations. Although the majority finds significance in the Supreme Court’s 0 Centro decision, see Maj. Op. at 1129 (“the Supreme Court has affirmed the RFRA rights of corporate claimants”), the fact of the matter is that the plaintiff in 0 Centro was a New Mexico non-profit corporation, specifically “[a] religious sect with origins in the Amazon Rainforest.” 546 U.S. at 423, 126 S.Ct. 1211. Thus, 0 Centro is entirely consistent with pre-RFRA free exercise precedent and tells us nothing about RFRA’s application to for-profit corporations.
The same can be said for Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). In Citizens United, the Supreme Court held that corporations have free speech rights under the First Amendment. But that holding has no bearing on our assessment of RFRA’s “context” because it was issued nearly twenty years after RFRA’s enactment, and it dealt with a different provision of the First Amendment than the one Congress was concerned with in RFRA. See generally Conestoga Wood Specialities Corp. v. Sebelius, 917 F.Supp.2d 394, 407-08, 2013 WL 140110 at *7 (E.D.Pa. Jan. 11, 2013) (“Although [the Free Speech and Free Exercise Clauses] reside within the same constitutional amendment, these two provisions have vastly different purposes and precedents, and we decline to make the significant leap Plaintiffs ask of us without clear guidance from Congress or the Supreme Court.”). In short, a 2010 Supreme Court decision concerning the First Amendment free speech rights of a corporation cannot, in retroactive fashion, impact our determination of what Congress intended when it enacted RFRA in 1993.[4]
*1170 In sum, “there is no plausible basis for inferring that Congress intended or could have anticipated” that for-profit corporations would be covered by RFRA. McQuiggin v. Perkins, — U.S. —, 133 S.Ct. 1924, 1942, 185 L.Ed.2d 1019 (2013) (Scalia, J., dissenting). The majority’s conclusion to the contrary thus “amounts to a pure judicial override of the statute Congress enacted.” Id.
C.
Having concluded that Hobby Lobby and Mardel qualify as “persons” for purposes of RFRA, the majority in turn concludes, “as a matter of constitutional law, [that] Free Exercise rights may extend to some for-profit organizations.” Maj. Op. at 1128. In doing so, the majority purports to rely on the precise body of case law that it ignored in assessing the “context” of RFRA, i.e., pre-RFRA “jurisprudence regarding who can bring Free Exercise claims.” Maj. Op. at 1133. And, despite the fact that, as I have explained, this jurisprudence does not include a single case extending free exercise rights to for-profit corporations, the majority concludes, remarkably, that at least some for-profit corporations enjoy free exercise rights.
How does the majority arrive at this conclusion? It first asserts, correctly, that the Supreme Court has recognized “ ‘a right to associate for the purpose of ... exercising] ... religion,’ ” Maj. Op. at 1133 (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (addressing claim brought by non-profit civic and service organization)), and that, consequently, “the Free Exercise Clause at least extends to associations like churches — including those that incorporate,” id.[5] It then asserts, again correctly, that “the Supreme Court has settled that individuals have Free Exercise rights with respect to their for-profit businesses,” i.e., sole proprietorships. Id. at 1134 (emphasis in original; citing Lee and Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)).
From there, however, the majority abandons its purported examination of pre-RFRA jurisprudence and “wander[s] into uncharted areas of the law with no compass other than [its] own opinions about good policy.” Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C., 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part and dissenting in part). To begin with, the majority, noting that the First Amendment was intended by Congress to protect not only belief but conduct, suggests that “religious conduct includes religious expression ... communicated by ... for-profit corporations,” Maj. Op. at 1134, such as the alleged efforts by Hobby Lobby and Mardel to “proselytize by purchasing hundreds of newspaper ads to ‘know Jesus as Lord and Savior,’ ” id. at 1135 (quoting JA at 24a). But the majority cites to no authority suggesting that Congress, either at the time of the First Amendment’s adoption or the passage of RFRA, remotely considered, let alone firmly believed, that for-profit corporations, as entities separate from the individuals that form them, could “exercise religion.”
*1171 Indeed, at the time of RFRA’s passage, the law had long distinguished between categories of corporations based upon “the specific purposes of their creation.” Bank of Augusta v. Earle, 38 U.S. 519, 580, 13 Pet. 519, 10 L.Ed. 274 (1839); see Lankford v. Menefee, 45 Okla. 228, 145 P. 375, 378 (1914) (“Every such corporation must be organized or incorporated for a particular purpose.”). In particular, “corporations [we]re, from the particular purposes to which they [we]re devoted, denominated spiritual, and some lay; and the latter ... again divided into civil and eleemosynary corporations.”[6] Trustees of Dartmouth College v. Woodward, 17 U.S. 518, 668, 4 Wheat. 518, 4 L.Ed. 629 (1819). And, quite logically, only those “spiritual” corporations, i.e., non-profit religious organizations, had been recognized as having the ability to “exercise religion.”
In turn, the majority, citing Citizens United, asserts there is “no reason [why] the Supreme Court would recognize constitutional protection for a corporation’s political expression but not its religious expression.” Maj. Op. at 1135. But, as I have already noted, there are a number of reasons why we must not allow Citizens United to impact our assessment of what Congress anticipated or intended when it enacted RFRA: Citizens United was issued nearly twenty years after RFRA; it dealt with the Free Speech Clause rather than the Free Exercise Clause of the First Amendment; and “mark[ed] a dramatic break from” the Court’s prior Free Speech precedents. Citizens United, 558 U.S. at 394, 130 S.Ct. 876 (Stevens, J., dissenting).
The majority next states that it “cannot see why an individual operating for profit retains Free Exercise protections but an individual who incorporates — even as the sole shareholder — does not, even though he engages in the exact same activities as before.” Maj. Op. at 1135. The obvious response to this is that, in the latter situation, a new entity separate from the natural individual has been formed. The Supreme Court has clearly stated that “incorporation’s basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.” Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). Consistent with these principles, Oklahoma law, under which Hobby Lobby and Mardel were created and continue to exist, provides that “even a family corporation is a separate and distinct legal entity from its shareholders.” Sautbine v. Keller, 423 P.2d 447, 451 (Okla.1966); see Fanning v. Brown, 85 P.3d 841, 846 (Okla.2004) (“Generally, a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it.”).[7] And, as I have noted, the specific purpose for which this new entity is created matters greatly to how it will be categorized and treated under the law.
*1172 The majority, obviously aware of these legal distinctions, asserts that “[t]his cannot be about the protections of the corporate form, such as limited liability and tax rates,” because “[rjeligious associations can incorporate, gain those protections, and nonetheless retain their Free Exercise rights.” Maj. Op. at 1135. In turn, the majority asserts, with no support other than its own view of public policy, that “sincerely religious persons could find a connection between the exercise of religion and the pursuit of profit.” Id. at 1135. Finally, the majority suggests, most remarkably and again with no support other than its own views, that the operation of a successful for-profit corporation can reasonably be viewed as a “form of evangelism” on the part of its owners. Id. Consequently, the majority concludes, such businesses, which it has effectively deemed “faith-based businesses” or businesses with a “religious mission,” are entitled to free exercise rights.
This is nothing short of a radical revision of First Amendment law, as well as the law of corporations. But whatever one might think of the majority’s views, the fact remains that they are wholly unsupported by the language of the Free Exercise Clause or the Supreme Court’s free exercise jurisprudence, and are thus, at best, “considerations for the legislative choice.” North Dakota State Bd. of Pharmacy v. Snyder’s Drug Stores, Inc., 414 U.S. 156, 167, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). Adhering to the Supreme Court’s holdings, as we must, there is, as I have explained, literally no support for the proposition that for-profit corporations enjoy free exercise rights.
Finally, the majority poses a series of hypothetical questions intended to call into question what it refers to as “the for-profit/non-profit distinction.” E.g., Maj. Op. at 1136 (“What if Congress eliminates the for-profit/non-profit distinction in tax law? Do for-profit corporations then gain Free Exercise rights? Or do non-profits lose Free Exercise rights?”). But that purported distinction is not entirely accurate. As I have explained, the Supreme Court’s free exercise jurisprudence tells us two key things: non-profit religious organizations, including those that have assumed the corporate form, enjoy free exercise rights; for-profit corporations have never been recognized as enjoying free exercise rights. Whatever theoretical distinctions might be raised by the majority concerning categories of non-profit corporations are immaterial for purposes of this appeal because it is undisputed that Hobby Lobby and Mardel are for-profit corporations focused on selling merchandise to consumers. Under the Supreme Court’s free exercise jurisprudence, there is no basis for concluding that they enjoy free exercise rights.
D.
Having concluded that RFRA’s protections may, at least in some instances, extend to for-profit corporations, the majority proceeds to conclude that Hobby Lobby and Mardel in particular are entitled to RFRA’s protections. In doing so, the majority lists, but does not otherwise explain, four factors that it considers relevant to that determination: (1) “Hobby Lobby and Mardel are not publicly traded corporations”; (2) “they are closely held family businesses with an explicit Christian mission as defined in their governing principles”; (3) “[t]he Greens ... have associated through Hobby Lobby and Mardel with the intent to provide goods and services while adhering to Christian standards as they see them, and they have made business decisions according to those standards”; and (4) “the Greens are unanimous in their belief that the contraceptive-coverage requirement violates the religious *1173 values they attempt to follow in operating Hobby Lobby and Mardel.” Maj. Op. at 1137.
In my view, these factors are problematic. To begin with, the first and second factors emphasize the fact that Hobby Lobby and Mardel are closely held corporations. But the majority offers no explanation as to why that factor is key in affording Hobby Lobby and Mardel rights under RFRA. And, in turn, the majority fails to explain whether (or why) registration as a publicly held corporation deprives a for-profit corporation of rights under RFRA.
As I see it, the publicly-held/closely-held distinction identified in the first and second factors, as well as the “unanimity of belief’ mentioned in the fourth factor, are relevant only to the extent that they allow the majority to take into account the personal religious beliefs of the corporations’ founders and owners — although, as I have noted, the Greens apparently do not directly own Hobby Lobby or Mardel, but rather these corporations are owned by trusts that are not named as party plaintiffs. Indeed, the majority’s stated third and fourth factors make that clear by emphasizing the Greens’ religious beliefs in general, and their beliefs regarding the contraceptive-coverage requirement in particular. But by doing so, the majority disregards the legal distinctions between the corporate entities and the individual founders/owners. Nothing that I am aware of in federal or Oklahoma state law allows the majority to do so. To be sure, “Oklahoma has long recognized the doctrine of disregarding the corporate entity in certain circumstances.” Fanning, 85 P.3d at 846. In particular, Oklahoma “[cjourts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice.” Id. Neither the plaintiffs nor the majority, however, cite to a single case that would allow us to employ these doctrines in a situation such as this. Moreover, as some of the defendants’ amici have noted, it is simply unreasonable to allow the individual plaintiffs in this case to benefit, in terms of tax and personal liability, from the corporate/individual distinction, but to ignore that distinction when it comes to asserting claims under RFRA.
Although the plaintiffs have argued that Hobby Lobby and Mardel may bring RFRA claims on behalf of the individual plaintiffs in a representative capacity, there is no indication that the majority agrees with that argument or is otherwise relying on the doctrine of associational standing. Indeed, the majority appears to recognize that the doctrine of associational standing does not apply to the alleged facts of this case. Maj. Op. at 1136 n. 11 (“This is not a special case of associational standing.”); see United Food and Comm. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (discussing “[t]he modern doctrine of associational standing, under which an organization may sue to redress its members’ injuries, even without a showing of injury to the association itself’); Harris v. McRae, 448 U.S. 297, 321, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (holding that a non-profit religious organization lacked associational standing to assert the free exercise rights of its members). But, notwithstanding its apparent rejection of plaintiffs’ associational standing argument, the majority nevertheless looks to the religious beliefs of the individual plaintiffs in assessing whether the corporate plaintiffs, Hobby Lobby and Mardel, are entitled to protection under RFRA.
*1174 To be sure, the second factor listed by the majority emphasizes the purported “explicit Christian mission” of the two corporate plaintiffs. But all we know at this point, based upon the limited record, is that Hobby Lobby’s statement of purpose allegedly includes a reference to “Biblical principles.” JA at 22a. Precisely why that is sufficient to accord Hobby Lobby rights under RFRA is unexplained by the majority. Indeed, the majority dodges several related questions: (1) whether a corporation can “believe” at all, see Citizens United, 130 S.Ct. at 972, 130 S.Ct. 876 (“It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires.”) (Stevens, J., concurring in part and dissenting in part); (2) if so, precisely how courts are to go about determining a for-profit corporation’s religious beliefs, and (3) whether a for-profit corporation has “cognizable religious liberties independent of the people who animate” it, Grote v. Sebelius, 708 F.3d 850, 856 (7th Cir.2013) (Rovner, J., dissenting).
Curiously, the majority declines to indicate whether the four factors it mentions are intended to be exclusive, or even controlling. Maj. Op. at 1137 (“We need not decide today whether any of these factors is necessary.”). Likewise, it refuses to address concerns raised by the defendants concerning how the factors might translate to “a large publicly traded corporation [seeking] to assert religious rights under RFRA.” Id. at 1137. Thus, the precise scope of the majority’s holding remains unclear. That said, however, it is difficult to imagine why the majority’s holding would not apply to any number of large, closely-held corporations that employ far more employees, and generate substantially more revenue, than Hobby Lobby and Mardel.
And, if all it takes for a corporation to be categorized as a “faith based business” for purposes of RFRA is a combination of a general religious statement in the corporation’s statement of purpose and more specific religious beliefs on the part of the corporation’s founders or owners, the majority’s holding will have, intentionally or unwittingly, opened the floodgates to RFRA litigation challenging any number of federal statutes that govern corporate affairs (e.g., Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act).[8] See City ofBoeme, 521 U.S. at 532, 117 S.Ct. 2157 (noting that RFRA’s “[sjweeping coverage” has the potential to “displace] laws and prohibit!] official actions of almost every description and regardless of subject matter.”); id. at 534, 117 S.Ct. 2157 (noting the potential of RFRA to exact “substantial costs ..., both in practical terms of imposing a heavy litigation burden on the [government] and in terms of curtailing [its] traditional general regulatory power”). In short, the majority’s holding threatens to entangle the government in the impermissible business of determining whether for-profit corporations are sufficiently “religious” to be enti *1175 tied to protection under RFRA from a vast array of federal legislation. See Snyder v. Murray City Corp., 159 F.3d 1227, 1243 (10th Cir.1998) (Lucero, J., concurring) (“[A]s Madison recognized, ‘religion flourishes in greater purity, without than with the aid of Government.’ ” (alteration omitted) (quoting James Madison, Memorial and Remonstrance against Religious Assessments (1785), in The Complete Madison 309 (S. Padover ed.1953))).
E.
For all of these reasons, I reject the majority’s conclusion that Hobby Lobby and Mardel are “persons” exercising religion for purposes of RFRA. And, consequently, I conclude on that basis that Hobby Lobby and Mardel have failed to carry their burden of establishing a likelihood of success on the merits of their RFRA claims.

TV. Substantial Burden

In the second part of its merits analysis, the majority addresses the question of “whether the contraceptive-coverage requirement constitutes a substantial burden on plaintiffs’ exercise of religion.” Maj. Op. at 1137. At the outset, the majority purports to “identify the religious belief in this case.” Id. at 1140. But it commits two errors in doing so.
To begin with, the majority once again conflates the alleged beliefs of the individual and corporate plaintiffs. In particular, the majority states that “[t]he corporate plaintiffs believe life begins at conception.” Id. To be sure, the complaint reasonably alleges that the individual plaintiffs possess this belief. But nothing in the plaintiffs’ complaint suggests that Hobby Lobby or Mardel have ever taken an official stance on this particular topic. Instead, the complaint alleges only that Hobby Lobby’s statement of purpose makes reference to “Biblical principles.” JA at 22a. Consequently, the majority is left to treat the religious beliefs of the individual plaintiffs as those of Hobby Lobby and Mardel, even though doing so violates basic principles of corporation law.
The majority also fails to carefully parse, and thus overstates, the nature of the plaintiffs’ religious beliefs. It is undisputed that the individual plaintiffs believe, as part of their religion, that “life begins at conception.” Maj. Op. at 1140. But, in addition to erroneously treating these beliefs as belonging to the corporate plaintiffs, the majority erroneously concludes that these beliefs encompass the plaintiffs’ views regarding the contraceptive drugs Plan B and Ella, as well as certain intrauterine devices.
I agree that the clear offshoot of plaintiffs’ belief that life begins at conception is their belief, also religious in nature, that any action that threatens to harm a fertilized egg, including by preventing it from implanting in the uterus, is immoral. But what is the connection between these religious beliefs and plaintiffs’ opposition to Plan B, Ella, and certain intrauterine devices? According to plaintiffs’ complaint and their motion for preliminary injunction, it is statements from the Food and Drug Administration (FDA), in particular an “FDA birth control guide,” suggesting “that Plan B and Ella may work by preventing ‘attachment (implantation)’ of a fertilized egg to a woman’s uterus.” JA at 33a (complaint); see id. at 50a (allegation in complaint that “[s]ome FDA-approved ‘contraceptives’ cause abortions.”) and 70a (reference in motion for preliminary injunction to “FDA Birth Control Guide”). In other words, the connection is not one of religious belief, but rather of purported scientific fact, i.e., how the challenged contraceptives operate to prevent pregnancy. Consequently, rather than being off limits to examination, plaintiffs’ allegations regarding the abortion-causing potential of *1176 the challenged drugs are subject not only to examination but evidentiary proof. In short, they must be proven by plaintiffs on the basis of sufficient evidence.
As I have noted, however, plaintiffs presented no evidence at all during the hearing on their motion for preliminary injunction. That failure is not entirely fatal to their claims, because there appears to be agreement among the parties and amici that certain intrauterine devices actually have, as a matter of scientific fact, the potential to prevent implantation of a fertilized egg. But there is no such consensus with respect to the contraceptive drugs challenged by the plaintiffs. E.g., Br. of Amici Curiae Physicians for Reprod. Health, et al., at 8-15 (discussing the current scientific evidence regarding how the challenged contraceptive drugs function to prevent pregnancy and asserting that the FDA labels for these drugs do not reflect this evidence). Consequently, plaintiffs’ tactical decision to present no evidence on this point appears, to me, to prevent them from establishing that the regulatory requirement to provide healthcare coverage encompassing these drugs substantially burdens their exercise of religion.

V Remaining Preliminary Injunction Factors

I also believe that the plurality errs in its consideration of the three remaining preliminary injunction factors, i.e., whether Hobby Lobby and Mardel face irreparable harm, whether the balance of equities tips in favor of Hobby Lobby and Mardel, and whether an injunction is in the public interest. The plurality suggests it is proper for this court to address each of those factors in the first instance because “[t]he record we have is the record the parties chose to create below,” Maj. Op. at 1033-34, “this record suffices for us to resolve each of the remaining preliminary injunction factors,” id., RFRA is analogous to constitutional law and thus plaintiffs’ likelihood of success on the merits of their RFRA claims should be considered a determinative factor, id. at 1145-46, and the government did not “contest[ ] the factual adequacy or accuracy of Hobby Lobby’s allegations,” all of which were contained in “a verified complaint,” id. at 1146.
Surely, however, the plaintiffs, as the parties who unsuccessfully moved for a preliminary injunction and now appeal from the district court’s decision, must be required to present some evidence to establish the remaining three preliminary injunction factors. Although the plurality suggests that the existing record is sufficient to resolve the remaining factors, the plaintiffs presented literally no evidence at the preliminary injunction hearing. And, although it is true that plaintiffs filed a verified complaint, defendants have not yet had an opportunity to file an answer to the complaint. Thus, we do not yet know which of the plaintiffs’ allegations might be admitted by the defendants. Finally, we must not forget that the district court denied plaintiffs’ motion for preliminary injunction based solely on its conclusion that plaintiffs failed to demonstrate a probability of success on the merits of their RFRA claims. JA at 228a-229a. Consequently, the district court concluded “it [wa]s unnecessary to determine whether the three other [preliminary injunction] factors tipfped] in [plaintiffs’] favor.” Id. at 229a n. 19. It is thus completely understandable why the defendants in this appeal have focused their arguments on the likelihood of success factor: that, as I have noted, was the sole basis for the district court’s decision. And, presumably, the defendants believed, and reasonably so, that if we disagreed with the district court’s conclusion, we would remand the case to the district court for further consideration of the remaining three preliminary injunction factors (all of which the defendants vigorously disputed in opposing plaintiffs’ *1177 motion for preliminary injunction in the district court proceedings, see id. at 156a-158a).

VI. The Individual Plaintiffs’ Standing to Sue under RFRA

As a final matter, I believe it necessary to briefly address several points raised by Judge Gorsuch and Judge Matheson regarding the Article III standing of the individual plaintiffs.
At the outset of his concurring opinion, Judge Gorsuch asserts that “[n]o one before us disputes that the [regulation] compels Hobby Lobby and Mardel to underwrite payments for drugs or devices that can have the effect of destroying a fertilized human egg.” Gorsuch Op. at 1152. As I have already explained, however, there are, indeed, factual disputes regarding the actual potential of the challenged drugs to destroy a fertilized human egg. And because the plaintiffs collectively failed to present any evidence to support their allegations regarding these challenged drugs, there is no basis upon which a preliminary injunction could be issued that relieves Hobby Lobby and Mardel from offering its employees coverage for those drugs.
Judge Gorsuch proceeds to suggest that there are two bases upon which the individual plaintiffs have Article III standing. First, he suggests the individual plaintiffs have Article III standing “because the company shares of which they are the beneficial owners would decline in value if the mandate’s penalties for noncompliance were enforced.” Id. at 1154. Although there is no disputing the principle that “shareholders suffer injury in the Article III sense when the corporation incurs significant harm, reducing the return on their investment and lowering the value of their stockholdings,” Grubbs v. Bailes, 445 F.3d 1275, 1280 (10th Cir.2006), the problem in this case is that, as far as we know, the individual plaintiffs are not the shareholders of Hobby Lobby and Mardel. Rather, plaintiffs’ complaint alleges that both corporations are owned by trusts. JA at 13a. Thus, there is no basis in the limited record on appeal for concluding that the individual plaintiffs can rely on this principle of Article III standing. And even if we were to assume otherwise, I agree with the views expressed in Section II of Judge Bacharach’s concurring opinion that Congress did not abrogate prudential-standing restrictions in RFRA and that the shareholder standing rule would prevent the individual plaintiffs from asserting distinct claims under RFRA.
Judge Gorsuch and Judge Matheson, in their separate concurring opinions, also suggest that the individual plaintiffs have Article III standing on the basis of a novel “management standing” rule. As Judge Gorsuch describes it in his concurring opinion, the individual plaintiffs, “as the exclusive and controlling owners of Hobby Lobby and Mardel, are the human beings who must direct the corporations to comply with the [contraceptive-coverage regulation] and do so in defiance of their faith.” Gorsuch Op. at 1156. On this point, I agree with Judge Bacharach that the so-called “choice” that results from the contraceptive-coverage regulation “falls solely on the two corporations, and the [individual plaintiffs]’ injury is not directly or personally created by the Affordable Care Act.” Bacharach Op. at 1163.
In addition, to the extent the individual plaintiffs in this case are involved in the corporate decisionmaking of Hobby Lobby and Mardel, I am not persuaded that the contraceptive-coverage regulation imposes a substantial burden on the exercise of their religion. The contraceptive-coverage regulation requires employers such as Hobby Lobby and Mardel to provide to their employees health insurance coverage *1178 for the Ml range of FDA-approved contraceptive drugs and devices. Period. Although the plaintiffs, and in turn Judge Matheson, artfully suggest that compliance with the regulation “would assist others in using particular contraceptives,” Matheson Op. at 1186, the fact of the matter is that the regulation is drug/device-neutral. And the decision of a female employee as to which contraceptive drug or device to use remains a private matter of individual choice. Thus, neither an employer, nor its officers and directors, by choosing to comply with the contraceptive-coverage regulation, become a party to, or otherwise encourage, an individual employee’s decision to use a particular drug or device. See Grote, 708 F.3d at 865 (Rovner, J., dissenting) (“No individual decision by an employeer and her physician — be it to sue contraception, treat an infection, or have a hip replaced — is in any meaningful sense the [employer’s or company owner’s] decision or action.”); of. Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (upholding a state school voucher program on the ground that “[t]he incidental advancement of a religious mission ... is reasonably attributable to the individual [voucher] recipient, not to the government, whose role ends with the disbursement of benefits.”). But, by recognizing a new “management standing” rule applicable to the individual plaintiffs, Judge Gorsuch and Judge Matheson “upend th[is] traditional understanding” and effectively conclude “that when a company insures its employees’ health care, a company owner indeed is a party to that care, with a cognizable religious interest in what services are made available to the employee.” Grote, 708 F.3d at 865 (Rovner, J., dissenting). In my view, “Molding that a company [owner]’s religious beliefs and practices are implicated by the autonomous health care decisions of company employees, such that the obligation to insure those decisions, when objected to by [the owner], represents a substantial burden on that [owner]’s religious liberties [is] an [unduly] expansive understanding of what acts in the commercial sphere meaningfully interfere with an individual’s religious beliefs and practices.” Id. at 866.

. Obviously, there were no "related congressional Acts” that existed at the time of RFRA’s passage. Because, however, RFRA was intended to effectively overrule Smith and supplement the existing body of free exercise case law, City of Boeme, 521 U.S. at 531, 117 S.Ct. 2157 (noting that RFRA was intended "to attempt a substantive change in constitutional protections”), it is precisely that existing body of free exercise case law that provides the proper context for understanding the text of RFRA.

. The majority ignores this inquiry and instead concludes, after discussing religious ex-eruptions contained in Title VII, the Americans with Disabilities Act, and the National Labor Relations Act, that "Congress knows how to craft a corporate religious exemption, but chose not to do so in RFRA.” Maj. Op. at 1129-30. But those statutes, all of which address the relationship between an employer and an employee, are significantly different than RFRA and, in my view, do not support the majority’s assumption that Congress anticipated that for-profit corporations would be deemed “persons” under RFRA. Indeed, I believe we must assume just the opposite since, at the time of RFRA’s passage, Con *1168 gress had never exempted for-profit corporations, on the basis of religious reasons, from any of these employment-related laws. As I discuss in greater detail below, affording for-profit corporations rights under RFRA effectively creates a religious-based exemption to any number of federal statutes, including all of those that impact the employer-employee relationship. Because, however, Congress has never expressly created any such exemption in any employment-related laws, it is improper for us to effectively create such exemptions based upon Congress’s silence in employing the term "person” in RFRA.

. The majority properly acknowledges, as it must, that the plaintiffs carry two related burdens at this stage of the proceedings. First, to establish their entitlement to a preliminary injunction. Maj. Op. at 1128. Second, to prove that there is a substantial likelihood that they will establish "a prima facie case under RFRA by showing that the government substantially burdens a sincere religious exercise.” Id. at 1126. But in addressing whether Hobby Lobby and Mardel "can take advantage of RFRA's protections,” Maj. Op. at 1131, the majority quite clearly places the burden of persuasion on the defendants, rather than on the plaintiffs who, as the parties seeking relief under RFRA and the movants seeking preliminary injunctive relief, properly carry that burden. In particular, the majority, rather than examining what precedents, if any, the plaintiffs can muster in support of their position, focuses almost exclusively on the defendants’ arguments in opposition to the plaintiffs' RFRA claims. E.g., at 1128 ("The government makes two arguments for why this is not the case.”), id. ("We reject both of these arguments.”), 1131 ("we do not see what the government sees in Amos ”), id. ("Nor do the other post-RFRA circuit cases on which the government relies provide more guidance.”), 1132 ("to the extent the government sees Spencer and Great Falls as following principles laid down in Amos ... we disagree.”), id. ("In conclusion, the government has given us no persuasive reason to think that Congress meant 'person' in RFRA to mean anything other than its default meaning in the Dictionary Act”).

. To the extent the majority means to suggest that RFRA can incorporate evolving free exercise or First Amendment case law, that view is simply wrong. Although RFRA originally defined free exercise as “the exercise of religion under the First Amendment to the Constitution, 42 U.S.C. § 2000bb-2(4) (1999), Congress subsequently amended this part of RFRA to instead provide a fixed statutory definition of religious exercise for both RFRA *1170 and the Religious Land Use and Institutionalized Persons Act of 2000. This fixed statutory definition makes no reference to the First Amendment and instead provides that “religious exercise” includes “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000cc-5(7)(A).

. In doing so, the majority cites to, but does not place significant reliance on, the Supreme Court’s decision in Citizens United. Maj. Op. at 1133. As I have already explained, I agree that Citizens United, which held that corporations have free speech rights under the First Amendment, has no bearing on the outcome of this appeal.

. In this case, it is quite clear even from the little we know about Hobby Lobby and Mardel that, notwithstanding the intentions of the Green family to operate them in a manner consistent with Biblical principles, they were created for the specific purpose of selling goods and making a profit. In other words, nothing in the record on appeal remotely suggests that Hobby Lobby and Mardel were created primarily to function as a vehicle through which a group of believers could associate and collectively exercise their religion.

. Given the apparent ownership structure of the two corporate plaintiffs in this case, the majority would apparently have us disregard two organizational structures: first, the corporate structure of Hobby Lobby and Mardel; second, the organizational structure of the trusts that actually own Hobby Lobby and Mardel.

. Americans United for Separation of Church and State assert in their amicus brief, and I agree, that the majority’s holding would transcend the provision of coverage for contraception. A Jehovah’s Witness could choose to exclude blood transfusions from his corporation's health-insurance coverage. Catholic-owned corporations could deprive their employees of coverage for end-of-life hospice care and for medically necessary hysterectomies. Scientologist-owned corporations could refuse to offer their employees coverage for antidepressants or emergency psychiatric treatment. And corporations owned by certain Muslims, Jews, or Hindus could refuse to provide coverage for medications or medical devices that contain porcine or bovine products — including anesthesia, intravenous fluids, prostheses, sutures, and pills coated with gelatin.
Br. of Amici Curiae Am. United for Separation of Church and State, Inc., at 35.